

United States Courts
Southern District of Texas
**FILED**

SEP 15 2016

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO. |
| ANDREW IAN FARMER<br>THOMAS GALEN MASSEY | FILED UNDER SEAL<br>16 CR 0408 |

### INDICTMENT

The Grand Jury charges:

**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order.

### GENERAL ALLEGATIONS

#### I. The Fraudulent Scheme

1. From in or about May 2011 through at least in or about December 2012, the defendants and others known and unknown engaged in an unlawful scheme to fraudulently manipulate the market price and demand for the stock of Chimera Energy Corp. ("Chimera"), and to defraud the public into buying the stock of Chimera, in order that Andrew Farmer, Thomas Massey, and their associates could profit from the sale of substantial quantities of Chimera stock that they controlled at fraudulently inflated prices.

**A. Chimera's "Sham" Initial Public Offering**

2. In or about the summer of 2011, Farmer met C.G., and C.G. agreed to become the Chief Executive Officer ("CEO") of Chimera. Shortly thereafter, on or about August 5, 2011, C.G. filed documents to incorporate Chimera and became its first CEO and its sole officer and director.

3. From in or about December 2011 to in or about January 2012, Chimera conducted a sham Initial Public Offering ("IPO"). Farmer and his associates recruited individuals to act as "straw-investors" in the Chimera IPO in order to make it appear that ownership of the freely

tradeable shares of Chimera stock was not concentrated in one person or a group of people, when in truth and fact, Farmer and his associates had de facto control of the freely tradeable shares of Chimera stock through the straw-investors.

### B. Form 211 Application Process Background

4. Microcap securities such as Chimera generally are characterized by low share prices and little or no analyst coverage. The issuers of microcap securities typically are thinly-capitalized and information about them often is limited. Microcap companies' stocks are not listed on national stock exchanges, such as the New York Stock Exchange ("NYSE"); rather, they are usually quoted on other quotation mediums, such as the Over-the-Counter ("OTC") Bulletin Board, or in the Pink Sheets published by the National Quotation Bureau. Because of the lack of information about microcap securities, when a broker-dealer publishes quotations for a microcap stock, it raises the profile of the security. Thus, published quotations enable persons engaged in microcap fraud to sell the shares to unsuspecting investors at inflated prices.

5. Microcap securities are regulated by the Financial Industry Regulatory Authority ("FINRA"). Before a broker-dealer can publish a quotation for a microcap security, the broker-dealer must submit an application on Form 211 and obtain prior authorization from FINRA's OTC Compliance Unit.

6. In addition, the U.S. Securities and Exchange Commission ("SEC") has published a list of "red flags" that, if detected, a broker-dealer should address before it can publish a quotation of a microcap security. One such red flag is the "concentration of ownership of freely tradeable securities" in one person or a group of people, which the SEC has identified as a "prominent feature of microcap fraud cases." This red flag is the reason that Farmer had to conceal his involvement

in the Chimera IPO by distributing the stock to the 29 straw-investors in order to create the false appearance of diversified ownership.

### C.      Chimera's Form 211 Application

7.      On or about December 22, 2011, Farmer contacted the broker-dealer Pennaluna to request Pennaluna sponsor a Form 211 application for Chimera in order to publish a quotation of Chimera stock.

8.      As part of its diligence and compliance process, Pennaluna required Chimera to provide certain information regarding the shareholders and how they were solicited to invest in Chimera. Farmer and his associates responded to the inquiry with information that concealed the facts that the IPO investors were in fact straw-investors for Farmer and his associates, and that ownership of the majority of outstanding, freely tradeable stock of Chimera was therefore concentrated in the hands of Farmer and his associates.

9.      On or about January 24, 2012, Pennaluna submitted the Form 211 application to FINRA's OTC Compliance Unit. On or about February 1, 2012, a FINRA compliance examiner sent Pennaluna a letter in which he explained that the Chimera application had been found "deficient" and requested additional information regarding the relationship between Farmer and Chimera.

10.     On or about February 3, 2012, C.G. submitted Chimera's response to FINRA's deficiency letter to Pennaluna for the purpose of transmitting the response to FINRA. The response continued to conceal the extent of Farmer's involvement in Chimera's IPO and his de facto control over the company and the straw-investors. On or about February 6, 2012, Pennaluna submitted Chimera's response to FINRA.

11. On or about April 10, 2012, FINRA cleared Pennaluna's Form 211 application to publish quotations of Chimera stock.

### D. Consolidation of Chimera Stock in the Hands of Farmer and His Associates

12. From in or about March 2012 to in or about May 2012, 28 of the 29 straw-investors transferred all of their shares to one of the following seven entities:

    a. Chartered Investments, a company owned by Farmer;

    b. Oak Resources, a company putatively owned by Farmer's former assistant, L.C. Farmer was authorized to conduct transactions in the bank account of Oak Resources.

    c. TransAmerica Trading, a company owned by C.A., the mother and step-mother of several straw-investors.

    d. Kylemore Corp.

    e. Hillsmere, S.A.

    f. Clarent Services Corp.

    g. Levantera, S.A.

13. The only straw-investor that did not sell her shares at this time was Farmer's wife, A.T.

### E. Farmers' False Promotional Campaign Regarding Chimera

14. Beginning in or about July, 2012, the defendants orchestrated a false promotional campaign designed to fraudulently inflate the price of Chimera stock.

15. On or about July 27, 2012, Farmer caused the filing of a Form 8-K with the SEC in which Chimera announced that it had entered into a "License Agreement" with "China Inland Oil Exploration Company" ("China Inland"), purportedly granting Chimera an "exclusive license to

develop and commercialize [China Inland's] cutting edge technologies related to Non-Hydraulic Extraction [("NHE")]."

16.     Chimera's purported agreement with China Inland and the NHE technology itself were both entirely fictitious. Chimera did not have an agreement with China Inland, or any other company, to license NHE technology, and Chimera did not have the NHE technology they claimed to have.

17.     Over the next several months, the defendants and their associates caused Chimera to issue approximately 34 press releases and three additional Forms 8-K that publicized and promoted Chimera's purported licensing and development of the non-existent NHE technology.

18.     While these false statements were being published, the defendants and their associates funded a false advertising campaign for Chimera stock. The defendants and their associates engaged Crisp Media, an advertising placement firm, to run ads that touted Chimera's "NEW SAFE FRACKING!" that "USES ZERO WATER!" and urged viewers to "INVEST TODAY."

19.     The defendants and their associates also engaged Marchex, another advertising placement firm, to display text advertising through the Google mobile advertising network. The text that was displayed in these advertisements included statements claiming that Chimera had a "Newly licensed method" that "uses zero water and is environmentally neutral."

20.     The defendants and their associates also engaged Dow Jones & Company, publisher of The Wall Street Journal, MarketWatch, SmartMoney, and Barrons, to display images advertising Chimera on these publications' websites. The images that were displayed touted Chimera's "NEW SAFE FRACKING" method and urged viewers to "INVEST TODAY."

F. **The Sale of Chimera Stock to the Public for the Farmer's Benefit**

21. While the defendants were conducting the false advertising campaign for Chimera stock, the price of Chimera stock increased dramatically, and Farmer and his associates began to sell their Chimera stock to the public for Farmer's benefit.

22. Chartered Investments:

   a. From on or about June 29, 2012 to on or about September 27, 2012, Chartered Investments sold approximately 1,148,322 shares of Chimera stock for total proceeds of approximately $692,554.51.

23. TransAmerica Trading:

   a. From on or about July 30, 2012 to on or about August 23, 2012, TransAmerica Trading sold approximately 2,800,000 shares of Chimera stock for total proceeds of approximately $3,224,630.87.

   b. From on or about August 10, 2012 to on or about August 30, 2012, TransAmerica Trading transferred $3,025,000 to Farmer's company Chartered Investments.

24. Oak Resources:

   a. From on or about June 20, 2012 to on or about November 15, 2012, Oak Resources sold approximately 2,212,146 shares of Chimera stock for total proceeds of approximately $682,229.49.

   b. From on or about August 10, 2012 to on or about November 27, 2012, Oak Resources transferred approximately $600,000 to Farmer and his company, Chartered Investments.

6

25. From in or about June 2011 to in or about December 2012, Farmer, through his companies Iridium and Chartered, paid Massey, through his company Fairwinds Consulting, approximately $333,000.00 as compensation for Massey's work in furtherance of the conspiracy.

## II. Objects of the Conspiracy

26. The objects of the conspiracy include: enriching the members and associates of the conspiracy by fraudulently manipulating the market price and demand for Chimera stock, and to defraud the public into buying the stock of those companies, in order that members and associates of the conspiracy could sell substantial quantities of Chimera stock that they controlled at fraudulently inflated prices.

## III. Manner and Means of the Conspiracy

27. Among the manner and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included the following:

    a. Recruiting individuals to act as "straw-investors" in the Chimera IPO in order to make it appear that ownership of the freely tradeable shares of Chimera stock was not concentrated in one person or a group of people.

    b. Concealing the true nature of the defendants and their associates' involvement in Chimera from FINRA, the SEC, and the investing public.

    c. Causing the publication and dissemination of false and misleading information about Chimera to the public through public filings, press releases, and public advertisements, in order to induce members of the investing public to purchase Chimera stock at fraudulently inflated prices.

## IV. Overt Acts

28. In furtherance of the conspiracy, and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Southern District of Texas and elsewhere:

29. On or about May 31, 2011, Farmer opened Chase Business Savings account XXX8374 for his company, Chartered Investments.

30. From in or about June 2011 to in or about December 2012, Farmer, through his companies Iridium and Chartered, paid Massey, through his company Fairwinds Consulting, approximately $333,000.00 as compensation for Massey's work in furtherance of the conspiracy.

31. On or about August 5, 2011, C.G. incorporated Chimera Energy Corporation in the state of Nevada.

32. On or about December 22, 2011, Farmer contacted Pennaluna by email in order to request that Pennaluna sponsor a Form 211 application to FINRA on behalf of Chimera. In the email, Farmer stated "neither Carolyn or myself are involved in the deal in any way."

33. On or about December 23, 2011, Farmer transferred $6,000 from his Iridium Capital account XXXX6635 to L.F. On or about December 22, 2011, L.F. and P.F., Andrew Farmer's father and mother, respectively, purchased 200,000 Chimera shares each, for a total cost of $6,000.

34. On or about December 23, 2011, Farmer transferred $6,300 from his Iridium Capital account XXXX6635 to J.R.D. On or about December 23, 2011, J.R.D. and A.D., both married to each other, purchased 200,000 Chimera shares each, for a total cost of $6,000.

35. On or about December 27, 2011, Farmer transferred $6,300 from his Iridium Capital account XXXX6635 to B.G. On or about December 27, 2011, B.G. and A.G.H., both married to each other, purchased 200,000 Chimera shares each, for a total cost of $6,000.

36. On or about January 6, 2012, Farmer transferred $3,000 from his personal checking account XXX8589 to L.C. through her Oak Resources account XXX8366. On or about January 6, 2012, L.C. purchased 200,000 Chimera shares for a total cost of $3,000.

37. On or about January 9, 2012, Farmer transferred $3,050 from his Iridium Capital account XXXX6635 to B.L. On or about January 9, 2012, B.L. purchased 200,000 Chimera shares for a total cost of $3,000.

38. On or about January 12, 2012, Farmer transferred $10,000 from his Iridium Capital account XXXX6635 to K.M. On or about January 11, 2012, K.M. and J.M., both married to each other, purchased 200,000 Chimera shares each, for a total cost of $6,000.

39. On or about January 24, 2012, Farmer caused a Form 211 application to be submitted to FINRA that concealed the facts that the 29 investors in Chimera's IPO were in fact straw-investors for Farmer and his associates, and that ownership of the majority of outstanding, freely tradeable stock of Chimera was therefore concentrated in the hands of Farmer and his associates.

40. On or about February 1, 2012, FINRA notified Pennaluna that Chimera's Form 211 application was deficient and requested additional information. Among the information requested by FINRA was, "A detailed explanation of the relationship between Andrew Farmer and [Chimera]," and "who solicited investors, [and] how the solicitor knew them." On or about February 6, 2012, C.G., acting pursuant to Farmer's instructions, caused Chimera's response to be submitted to FINRA, which continued to conceal the facts that the 29 investors in Chimera's IPO

9

were in fact straw-investors for Farmer and his associates, and that ownership of the majority of outstanding, freely tradeable stock of Chimera was therefore concentrated in the hands of Farmer and his associates.

41. On or about July 27, 2012, Farmer caused a Form 8-K to be filed with the SEC that falsely stated Chimera had entered into a "License Agreement" with "China Inland Oil Exploration Company" ("China Inland"), purportedly granting Chimera an "exclusive license to develop and commercialize [China Inland's] cutting edge technologies related to Non-Hydraulic Extraction."

42. On or about July 30, 2012, Massey caused a press release to be issued that falsely stated Chimera had "licensed Non-Hydraulic Extraction," and that Chimera had "put in place their procedure for engineering this new method for mass production, patenting, licensing, and sales."

43. On or about August 9, 2012, Massey caused a press release to be issued that falsely stated Chimera had "executed a Memorandum of Understanding with PEMEX, also known as Petroleos Mexicanos, regarding the utilization of [Chimera]'s revolutionary exothermic Non-Hydraulic Extraction method throughout Latin America."

44. On or about August 10, 2012, Farmer caused a Form 8-K to be filed with the SEC that included as an exhibit the false August 9, 2012 press release regarding the Memorandum of Understanding with PEMEX.

45. On or about August 10, 2012, Massey caused a press release to be issued that falsely stated Chimera management "has been scheduled to directly meet with PEMEX associates in Mexico City beginning this Monday regarding a collaboration for utilizing [Chimera's] revolutionary exothermic Non-Hydraulic Extraction method throughout Latin America."

46. On or about August 13, 2012, Massey caused a press release to be issued that falsely stated Chimera management "arrives in Mexico City this morning for their direct meetings with

PEMEX to collaborate on utilizing [Chimera's] revolutionary exothermic Non-Hydraulic Extraction system throughout Latin America."

47. On or about August 20, 2012, Massey caused a press release to be issued that falsely stated that Chimera's President, C.G., "has just returned from fruitful meetings in Mexico City, where PEMEX and Chimera have begun to collaborate on utilizing [Chimera's] revolutionary exothermic Non-Hydraulic Extraction system throughout Latin America."

48. On or about August 28, 2012, Farmer caused a Form 8-K to be filed with the SEC that falsely stated: "During our recent visit to PEMEX we discussed engineering plans to utilize our technology on 3 wells chosen by PEMEX," and "We have an executed Memorandum of Understanding with PEMEX related to our Non-Hydraulic Fracturing technology."

49. On or about September 11, 2012, Massey caused a press release to be issued that falsely stated Chimera management "has formulated a 90-day schedule for the first deployment of Non-Hydraulic Shale Oil Extraction in the Chicontepic Basin of Mexico."

50. On or about October 10, 2012, Massey caused a press release to be issued that falsely stated "Chimera Energy Corp and PEMEX Complete First Collaboration at Chicontepic Basin" and "the first activities in Poza Rica, Mexico between the two companies have been completed with very good results."

51. On or about October 10, 2012, Farmer caused a Form 8-K to be filed with the SEC that included as an exhibit a letter from Chimera's then-CEO to Chimera's shareholders that falsely stated: "Over the past several months we have worked tirelessly with our contacts at PEMEX to finalize the Master Service Agreement and get our technology into the field for testing," and "We have executed [sic] Memorandum of Understanding with PEMEX related to our Non-Hydraulic Fracturing technology."

11

52. On or about October 15, 2012, Farmer caused a letter to be submitted to the FINRA Office of Fraud Detection and Market Intelligence that (1) concealed the facts that Chimera's purported license agreement with China Inland Oil Exploration Company and NHE technology did not exist, and falsely stated (2) Chimera and its consultants "are working diligently" with PEMEX towards an onsite demonstration of the NHE technology, and (3) Chimera "is still in the process of negotiating the Master Service Agreement with PEMEX relating to the technology."

53. From on or about June 29, 2012, to on or about September 27, 2012, Farmer, through his company Chartered Investments, sold 1,148,322 shares of Chimera stock for total gross proceeds of $692,554.51.

54. From on or about July 30, 2012, to on or about August 23, 2012, TransAmerica Trading sold 2,800,000 shares of Chimera stock for total gross proceeds of $3,224,630.87.

55. From on or about August 10, 2012, to on or about August 30, 2012, TransAmerica Trading transferred $3,025,000 from account XXXX3283 to Farmer, through his company Chartered Investments.

56. From on or about June 20, 2012 to on or about November 15, 2012, Oak Resources sold 2,212,146 shares of Chimera stock for total gross proceeds of $682,229.49.

57. From on or about August 10, 2012, to on or about November 27, 2012, Oak Resources transferred approximately $600,000.00 from account XXXX8366 to Farmer's personal account XXXX8589 and Farmer's Chartered Investments account XXXX8374.

### COUNT ONE
### (Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349)

58. Paragraphs 1 through 57 of this Indictment are hereby incorporated by reference as though fully set forth herein.

59. From in or about May 2011 and continuing through at least in or about December 2012, in the Southern District of Texas and elsewhere, the defendants,

**ANDREW IAN FARMER, and
THOMAS GALEN MASSEY,**

knowingly and willfully conspired and agreed with each other, and other persons both known and unknown, to commit offenses against the United States, to wit: wire fraud, in violation of 18 U.S.C. § 1343, that is to devise and intend to devise, with intent to defraud, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted, by means of wire communication in interstate or foreign commerce, writings and signals for the purpose of executing the scheme and artifice, in violation of 18 U.S.C. §1349.

## COUNTS TWO THROUGH SEVENTEEN
### (Wire Fraud, 18 U.S.C. § 1343)

60. Paragraphs 1 through 57 of this Indictment are hereby incorporated by reference as though fully set forth herein.

61. From in or about May 2011 and continuing through at least in or about December 2012, in the Southern District of Texas and elsewhere, the defendants,

**ANDREW IAN FARMER, and
THOMAS GALEN MASSEY,**

aiding and abetting each other, and other persons known and unknown, devised and intended to devise, with intent to defraud, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

62. On or about each of the dates listed in the table below, in the Southern District of Texas, and elsewhere, the defendants, for the purpose of executing and attempting to execute the

scheme described above, did transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, the following writings and signals, as more specifically described below:

| COUNT | DATE | DEFENDANTS CHARGED PER COUNT | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| 2 | 12/23/2011 | A.I.F. | Wire transfer from Farmer's Iridium Capital account XXXX6635 to L.F. for $6,000 to fund L.F. and P.F.'s purchase of 400,000 shares of Chimera stock. |
| 3 | 12/23/2011 | A.I.F. | Wire transfer from Farmer's Iridium Capital account XXXX6635 to J.R.D. for $6,300 to fund J.R.D. and A.D.'s purchase of 400,000 shares of Chimera stock. |
| 4 | 12/27/2011 | A.I.F. | Wire transfer from Farmer's Iridium Capital account XXXX6635 to B.G. for $6,300 to fund B.G. and A.G.H.'s purchase of 400,000 shares of Chimera stock. |
| 5 | 1/9/2012 | A.I.F. | Wire transfer from Farmer's Iridium Capital account XXXX6635 to B.L. for $3,050 to fund B.L.'s purchase of 200,000 shares of Chimera stock. |
| 6 | 1/12/2012 | A.I.F. | Wire transfer from Farmer's Iridium Capital account XXXX6635 to K.M. for $10,000 to fund K.M. and J.M.'s purchase of 400,000 shares of Chimera stock. |
| 7 | 1/13/2012 | A.I.F. | Email from Farmer to C.G. instructing him to submit documents to Pennaluna related to Chimera's Form 211 application, which concealed the facts that the 29 investors in Chimera's IPO were in fact straw-investors for Farmer and his associates, and that ownership of the majority of outstanding, freely tradeable stock of Chimera was therefore concentrated in the hands of Farmer and his associates. |

| | | | |
|---|---|---|---|
| 8 | 2/3/2012 | A.I.F. | Email from Farmer to C.G. instructing him to submit documents containing Chimera's response to FINRA's February 1, 2012 deficiency letter, which concealed the facts that the 29 investors in Chimera's IPO were in fact straw-investors for Farmer and his associates, and that ownership of the majority of outstanding, freely tradeable stock of Chimera was therefore concentrated in the hands of Farmer and his associates. |
| 9 | 7/27/2012 | A.I.F. | Email from Farmer to A.V., copying C.G. and D.L., which caused a Form 8-K to be filed with the SEC containing a fraudulent "License Agreement" with "China Inland Oil Exploration Company," purportedly granting Chimera a license for the "exclusive use . . . of the environmentally friendly oil & gas extraction procedure . . . known as Non Hydraulic Extraction." |
| 10 | 7/30/2012 | A.I.F., T.G.M. | Transmission of a press release that falsely stated Chimera had "licensed Non-Hydraulic Extraction," and that Chimera had "put in place their procedure for engineering this new method for mass production, patenting, licensing, and sales." |
| 11 | 8/9/2012 | A.I.F., T.G.M. | Transmission of a press release that falsely stated Chimera had "executed a Memorandum of Understanding with PEMEX, also known as Petroleos Mexicanos, regarding the utilization of [Chimera]'s revolutionary exothermic Non-Hydraulic Extraction method throughout Latin America." |
| 12 | 8/10/2012 | A.I.F., T.G.M. | Transmission of a press release that falsely stated Chimera management "has been scheduled to directly meet with PEMEX associates in Mexico City beginning this Monday regarding a collaboration for utilizing [Chimera's] revolutionary exothermic Non-Hydraulic Extraction method throughout Latin America." |

| | | | |
|---|---|---|---|
| 13 | 8/13/2012 | A.I.F., T.G.M. | Transmission of a press release that falsely stated Chimera management "arrives in Mexico City this morning for their direct meetings with PEMEX to collaborate on utilizing [Chimera's] revolutionary exothermic Non-Hydraulic Extraction system throughout Latin America." |
| 14 | 8/20/2012 | A.I.F., T.G.M. | Transmission of a press release that falsely stated Chimera's President, C.G., "has just returned from fruitful meetings in Mexico City, where PEMEX and Chimera have begun to collaborate on utilizing [Chimera's] revolutionary exothermic Non-Hydraulic Extraction system throughout Latin America." |
| 15 | 8/28/2012 | A.I.F. | Email from Farmer to D.L., copying A.V., with attachment "CHMR - Shareholder Letter - 8.28.12.docx," which caused a Form 8-K to be filed with the SEC that falsely stated: "During our recent visit to PEMEX we discussed engineering plans to utilize our technology on 3 wells chosen by PEMEX," and "We have an executed Memorandum of Understanding with PEMEX related to our Non-Hydraulic Fracturing technology." |
| 16 | 9/10/2012 | A.I.F., T.G.M. | Email from Massey to C.G. requesting approval of a press release that falsely stated Chimera management "has formulated a 90-day schedule for the first deployment of Non-Hydraulic Shale Oil Extraction in the Chicontepic Basin of Mexico." |
| 17 | 10/9/2012 | A.I.F., T.G.M. | Email from Massey to B.R. requesting approval of a press release that falsely stated "Chimera Energy Corp and PEMEX Complete First Collaboration at Chicontepic Basin" and "the first activities in Poza Rica, Mexico between the two companies have been completed with very good results." |

63.     Each of the wire communications listed above constituting a separate and distinct violation of 18 U.S.C. § 1343.

## NOTICE OF CRIMINAL FORFEITURE
### 28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C)

Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the defendants,

**ANDREW IAN FARMER, and
THOMAS GALEN MASSEY,**

that in the event of conviction of any of the offenses charged in Counts 1 through 17 of this Indictment, the United States intends to seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

### Money Judgment

Defendants are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, for which the defendants may be jointly and severally liable. That amount is estimated to be, but is not limited to, approximately $6,889,497.01 in United States dollars.

### Substitute Assets

Defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission of defendants,

    (A)    cannot be located upon the exercise of due diligence;

    (B)    has been transferred or sold to, or deposited with, a third party;

    (C)    has been placed beyond the jurisdiction of the court;

    (D)    has been substantially diminished in value; or

    (E)    has been commingled with other property that cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the defendants up to the total value of such property pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 28, United States Code, Section 2461(c).

A TRUE BILL:

ORIGINAL SIGNATURE ON FILE

FOREPERSON OF THE GRAND JURY

KENNETH MAGIDSON
UNITED STATES ATTORNEY

Justin R. Martin
Assistant United States Attorney